Teresa **ELLISON**

v.

The **UNITED STATES.**

No. 663–88C.

United States Claims Court.

March 13, 1992.

Joseph B. Scott, Washington, D.C., attorney of record, for plaintiff. Kator, Scott & Heller, of counsel.

James W. Poirier, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for U.S. Hillary A. Stern, Dept. of Justice, and Lucille C. Roberts and Gerald M. Auerbach, U.S. Marshals Service, of counsel.

## OPINION

MEROW, Judge.

After a trial of the merits in this action, plaintiff Teresa Ellison seeks to recover damages from defendant for violation of the Equal Pay Act, 29 U.S.C. § 206(d) (EPA), by the United States Marshals Service (USMS). Ms. Ellison seeks retroactive promotion, back pay, liquidated damages and attorneys fees. Plaintiff alleges that she suffered monetary losses when the USMS failed to comply with the EPA by adjusting her salary grade and pay to the same level paid to males performing substantially equal work. Defendant contends that Ms. Ellison failed to establish a violation under the Equal Pay Act. It supports its contention on two foundations: 1) the work of the higher-salaried male branch chiefs of the USMS was not substantially equal to Ms. Ellison's work; 2) the reason that Ms. Ellison was denied a salary grade promotion was for factors other than gender, i.e., an alleged inability to get along with her immediate supervisors.

For the reasons stated below, it is concluded that the plaintiff is entitled to back pay and liquidated damages.

## FACTS

The USMS is a bureau within the Department of Justice, whose highest official is the Director. Reporting to the Director are a Deputy Director and two Associate Directors, one for Administration and one for Operations. The Directorates are further divided into Divisions and the Divisions are divided into Branches. These Headquarters offices support the 95 U.S. Marshals' offices nationally.

Plaintiff Teresa Ellison was appointed to the position of Branch Chief of the Managerial Assessment & Development (MAD) Branch in the Administrative Directorate of the USMS in September 1984 and was responsible for the Merit Promotion Program.[1] Joint Stips. 1, 2.

In October 1984, the Policies Development and Compensation (PEDC) Branch headed by Jack McCrory was abolished and Ms. Ellison was assigned responsibility to head certain programs previously supervised by Mr. McCrory, namely, the Supervisory & Management Training, Employee Development, and Employee Suggestion Programs. Joint Stip. 3. Ms. Ellison was promoted to a GM–13 in October 1984. Joint Stip. 7. She became eligible for a promotion to GM–14 in October 1985 after serving the requisite one-year in grade.[2] Joint Stip. 16.

In April 1986 the USMS underwent reorganization. As a result, the Employee Development Division was created and the MAD Branch became part of this division.[3] Joint Stip. 8.

In October 1986, Ms. Ellison had two years in grade as a GM–13. In November 1986 she submitted a request for a promotion to a GM–14 grade level, which was denied by Mr. Stanley Morris.[4] Tr. 457–58; 516–17.

---

1. Mr. Kenneth Holecko was the Chief of the Personnel Management Division and was Ms. Ellison's immediate supervisor from 1984 to April 1986. Mr. Gary Mead, Associate Director for Administration, was her second-level supervisor. Joint Stip. 9; Tr. 337.

2. See 5 C.F.R. § 300–602(a).

3. From April 1986 to September 1986, Mike Adams was Acting Division Chief of the newly-created Employee Development Division and was Ms. Ellison's immediate supervisor. In September 1986, Anthony Odom became Chief of the Employee Development Division and thus became Ms. Ellison's immediate supervisor. Associate Director Mead was still Ms. Ellison's second-level supervisor. Joint Stip. 9.

4. Mr. Stanley Morris was Director of the USMS from October 1983 through October 1989. Tr. 508. He was chair of the Career Development Board, the panel within the USMS which considered Ms. Ellison's promotion. This panel comprised the deputy director and two associate directors and was responsible for promotion decisions of headquarters personnel. Tr. 515.

Ms. Ellison's immediate supervisor, Anthony Odom, had recommended Ms. Ellison for a promotion to a GM–14, but then withdrew his recommendation on December 22, 1986 due to his assumption that she took part in a "letter incident" on December 19, 1986. Mr. Odom had sent a memorandum indicating that he wished to see all outgoing correspondence. A few days after this memo was circulated, three members of Ms. Ellison's MAD Branch staff deposited a substantial number of form letters on Mr.

In April 1987, Ms. Ellison's branch was assigned responsibility for the Employee Assistance Program.[5] Tr. 130, 910–11. In October 1987, she had three years in grade as a GM–13 and again submitted a request for promotion to GM–14. Joint Stip. 12.

In January 1988, the USMS underwent reorganization again, resulting in the creation of two new branches, the Employee Health & Assistance Branch (EHA) and the Supervisory & Management Training Branch (SMT). Three programs that were part of Ms. Ellison's MAD Branch were transferred to the EHA Branch, *i.e.*, the Fitness–in–Total (FIT) Program (Joint Stip. 14, 21), the Retirement Program (Tr. 137), and the Employee Assistance Program (Tr. 137, 917), and Ms. Ellison's management training program was transferred to the SMT Branch (Joint Stip. 24). In April 1988, Thomas Hurley was hired as Chief of the EHA Branch at a salary grade of GM–14. In approximately June of 1988, Peter Paul Mihailoff was hired as Chief of the SMT Branch as a salary grade of GM–14.

In April 1988 Ms. Ellison learned that her request for a promotion to a GM–14 was rejected for the second time by Mr. Morris. Tr. 162. At this time Associate Director Gary Mead[6] informed her that Mr. Morris had "definite ideas about the role of women in law enforcement" and that she would never be promoted to a GM–14. Tr. 162–63, 461. As a result, Ms. Ellison left her position with the MAD branch and was reassigned to the Personnel Management Division where she worked for Mr. Holecko. Tr. 161–62.

Accordingly, at all times while she was Chief of the MAD Branch Ms. Ellison was paid at a salary grade of GM–13.[7] Promotion to the GM–14 level was available in October 1985, after she had served one year in grade and had demonstrated that she was performing her duties competently. She was recommended for a promotion before the Career Development Board on two occasions, December 1986 and December 1987, but such promotion was denied because she did not have the endorsement of the Director, Mr. Stanley Morris. Ms. Ellison alleges that male branch chiefs who had responsibility for the same or substantially equal personnel management program areas in the Administrative Director-

---

Odom's desk. Mr. Odom attributed this incident to Ms. Ellison and considered that it was indicative of her disloyalty, but Mr. Odom obtained no proof of her involvement. Tr. 860. Jeanine Lauth, an employee development specialist in the MAD branch and a subordinate of Ms. Ellison's, testified that the MAD staff was specifically told by Ms. Ellison not to deliver the form letters, but did so "to make a point." Tr. 313. Mr. Odom did not directly communicate Ms. Ellison's alleged involvement in this incident to Mr. Morris, but did inform Mr. Morris' secretary upon withdrawing his recommendation that Ms. Ellison be promoted. Tr. 842.

5. In April 1987, Chuck Kupferer replaced Mr. Odom as Chief of the Employee Development Division and became Ms. Ellison's immediate supervisor. Joint Stip. 9.

6. On several occasions between 1986 and 1988, Mr. Mead lobbied former Director Stanley Morris for Ms. Ellison's promotion to GM–14. Tr. 450. Apparently, Ms. Ellison's friendship with Mr. Mead and her access to him without an appointment was a source of conflict between her and her immediate supervisors. For example, in reference to his decision not to promote Ms. Ellison to a GM–14, Mr. Morris testified as follows:

Q: [D]id you have anything particularly in mind when you indicated she [Ms. Ellison] was not loyal?
A: Yes. I would think the concerns that I had were essentially that she had been the prodigy of Gary Mead, had risen sort of on-time through four or so different grade levels quickly in the organization for a relatively *young woman*. Her, you know—Gary had been supportive of that. I had some concerns that that was not sufficient to me for an additional promotion in light of what, in fact, had been a track record of some disloyalty to her immediate supervisors, that is, Mr. Holecko, Mr. Odom, and later Mr. Kupferer, concerns that they raised about going around them because of her *pre-existing relationship* with Mr. Mead.

Tr. 520–21. However, Mr. Mead was never admonished or instructed to deny direct access to Ms. Ellison and he had a practice of directly dealing with branch chiefs. Tr. 249, 525.

7. The salary grade level for positions in the federal government is established at the time that the position is announced and is based on the duties and responsibilities set forth in the written position description prepared for the job. *See, e.g.,* Federal Personnel Manual (FPM), Ch. 312, Subch. 3, 3–2(b); Ch. 511, Subch. 2, 2–3.

ate were paid at a salary grade of GM–14. In this action, plaintiff asserts that defendant's failure to pay her the same salary as it paid males for substantially equal work violated the Equal Pay Act, 29 U.S.C. § 206(d).

## DISCUSSION

The initial issue for resolution is whether the work performed by Ms. Ellison in her capacity as a branch chief at the USMS was substantially equal to that of the more highly paid male branch chiefs (*i.e.,* Messrs. Mihailoff, McCrory and Hurley), *i.e.,* whether there was substantial equality of skill, effort and responsibility between her work and that of the three aforementioned branch chiefs. If the work is found to have been substantially equal in terms of skill, effort and responsibility, then it must be determined whether the USMS's failure to promote Ms. Ellison to the higher salary grade was willful, thus entitling Ms. Ellison to additional back pay under the EPA, and whether liquidated damages are owed.

### I. *Equal Pay Act*

A. Case Law.

The Equal Pay Act, 29 U.S.C. § 206(d), was enacted in 1963 as an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.,* and was extended to the federal government in 1974. 29 U.S.C. § 203(e)(2). The Supreme Court, in discussing the Equal Pay Act, made clear that the fundamental purpose of the Act was to remedy disparities in pay arising from traditional concepts of gender. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974).

The Equal Pay Act provides as follows, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

 The Supreme Court has stated that the EPA consists of two parts, a definition of the violation and four affirmative defenses. *County of Washington v. Gunther,* 452 U.S. 161, 169, 101 S.Ct. 2242, 2247, 68 L.Ed.2d 751 (1981). To establish a prima facie EPA claim a plaintiff must show that her employer has paid lower wages to her than to males for equal work requiring equal skill, effort and responsibility under similar working conditions. *Corning Glass Works v. Brennan,* 417 U.S. at 195, 94 S.Ct. at 2228; *E.E.O.C. v. Maricopa County Community College Dist.,* 736 F.2d 510, 513 (9th Cir.1984); *Molden v. United States,* 11 Cl.Ct. 604, 610 (1987).[8] Any difference in wages paid to the respective sexes for equal work is prohibited by the EPA, unless justified by one of the four statutory provisions. *E.E.O.C. v. Mercy Hosp. & Medical Ctr.,* 709 F.2d 1195, 1198 (7th Cir.1983). In the context of an Equal Pay Act analysis of two jobs, "equal" does not mean "identical," rather the jobs must require similar skills, effort and responsibility under similar working

---

**8.** The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high.

When Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved should be virtually identical, that is, they would be very

much alike or closely related to each other." The restrictions in the Act were meant "to apply only to jobs that are substantially identical or equal."

*Brennan v. City Stores, Inc.,* 479 F.2d 235, 238 (5th Cir.1973).

conditions. *Molden v. United States*, 11 Cl.Ct. 604, 610 (1987) (citing, *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3d Cir.1970)). In comparing two jobs, the inquiry must focus on the primary duties of each job, not those which are incidental or insubstantial. *Goodrich v. International Bhd. of Elec. Workers*, 815 F.2d 1519, 1524 (D.C.Cir.1987). Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable. 29 C.F.R. § 1620.14(a) (1990); *Corning Glass Works v. Brennan*, 417 U.S. at 203 n. 24, 94 S.Ct. at 2232 n. 24. "The controlling factor under the Equal Pay Act is job content—the actual duties the respective employees are called upon to perform." *Pearce v. Wichita County, etc., Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir.1979). It is the job as a whole, not just selected aspects of it that must form the basis of the comparison. *Gunther v. County of Washington*, 623 F.2d 1303, 1309 (9th Cir.1979), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ The plaintiff does not have to show that the wage disparity was sex-based; the burden of proving sexual bias is met solely by showing the existence of a wage differential between male and female employees doing equal work. *Molden v. United States*, 11 Cl.Ct. at 610. Furthermore, a plaintiff, in asserting an equal pay violation, need not show that a disparity in wages is the result of a discriminatory practice on the part of the employer. *Id.* Rather, to establish a prima facie case, it is merely necessary that the plaintiff show that an employer paid different wages to employees of the opposite sex for substantially equal work. *Id.* at 610–11.

■ Once a wage differential is shown between two substantially equal jobs, the burden then shifts to the employer to show by a preponderance of the evidence that the wage differential is due to one of the exceptions, or affirmative defenses, enumerated in the second part of the EPA. *Corning Glass Works v. Brennan*, 417 U.S. at 196–97, 94 S.Ct. at 2229. Merely asserting a plausible, non-gender based explanation is not sufficient. "It is well-known that when asserting an exception under [the EPA], [t]he burden [on the employer] of proving that a factor other than sex is the basis for the wage differential is a heavy one." *Brennan v. Owensboro–Daviess County Hosp.*, 523 F.2d 1013, 1031 (6th Cir.1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976). A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities. *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1083 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985).

■ The plaintiff need not compare herself to all similarly classified male employees, but may choose one or more among those allegedly doing substantially equal work. *Goodrich v. International Bhd. of Elec. Workers*, 815 F.2d at 1524.[9] An employee "need only show discrimination in pay against an employee vis-a-vis one employee of the opposite sex." *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir.1991) (citing, *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1009 (11th Cir.1989)). In other words, to prevail, Ms. Ellison has to show that at least one of the jobs held by the higher paid male branch chiefs is *substantially equal* in terms of skill, effort and responsibility to her job as Branch Chief of the MAD Branch.

---

9. In *Goodrich*, the Court stated:
 It is now established in this [the D.C.] circuit that the plaintiff need not compare herself to all similarly classified male employees, but may choose one or more among those allegedly doing substantially equal work. 815 F.2d at 1524. *See also Thompson v. Sawyer*, 678 F.2d 257, 275 (D.C.Cir.1982) ("To prove a violation under the Equal Pay Act, plaintiffs need only show their jobs were equal to the jobs of some bookbinders, but treated unequally. *Plaintiffs need not show that their jobs were substantially similar to all, or even most bookbinder jobs.*") (Emphasis added.)

## B. Damages Under the Equal Pay Act.

■■■■■ *Overview of Damage Provisions.* The Equal Pay Act must be read in conjunction with the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201, *et seq.*, and the Portal–to–Portal Act of 1947, 29 U.S.C.A. §§ 251, *et seq.* The Equal Pay Act does not provide for back pay, but back pay and liquidated damages can be recovered by the employee under the provisions of the FLSA, 29 U.S.C. § 216(b). An employer may then defend against liquidated damages under the Portal–to–Portal Act by establishing that he acted in good faith and had reasonable grounds to believe that he was not in violation of the statute, 29 U.S.C. § 260.

### 1. *Back Pay Recovery.*

■■■ The statute of limitations provision of the Fair Labor Standards Act, applicable to Equal Pay Act cases, specifies in relevant part that such actions:

> may be commenced within two years after the cause of action accrued, and * * * shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued * * *.

29 U.S.C. § 255(a).

In other words, if the USMS's actions are found to be "willful" within the meaning of this statutory provision, the plaintiff will be entitled to back pay for a three-year period. The meaning of the word "willful," as used 29 U.S.C. § 255(a), was defined by the Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).[10] This case was an appeal from the decision in *Brock v. Richland Shoe Co.*, 799 F.2d 80 (3rd Cir. 1986), which expressly rejected the *Jiffy June* standard and held that, for purposes of 29 U.S.C. § 255(a), a violation of the relevant sections of the FLSA is willful "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *Id.* at

**10.** Prior to the Supreme Court's decision in *McLaughlin v. Richland Shoe Co.*, there was some disagreement among the circuit courts regarding the definition of "willfulness" for purposes of the FLSA statute of limitations provision, 29 U.S.C. § 255(a). The *Jiffy June* standard, defined a matter as willful when "the employer knew or suspected that his actions might violate the [Fair Labor Standards Act]. Stated most simply ... Did the employer know the FLSA was in the picture?" *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Several circuit courts endorsed the lenient *Jiffy June* standard. *See Secretary of Labor v. Daylight Dairy Prods., Inc.,* 779 F.2d 784 (1st Cir.1985); *Donovan v. Bel–Loc Diner, Inc.,* 780 F.2d 1113, 1117 (4th Cir.1985); *Marshall v. Dallas Independent School Dist.,* 605 F.2d 191 (5th Cir.1979) (actual awareness of Equal Pay Act is unnecessary to establish willfulness of violation, knowledge being imputed to the employer); *Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83, 85 (10th Cir.1983) (a violation may be willful even if an employer does not have specific knowledge that his actions violate the Act). Other courts, such as the third circuit in *Brock v. Richland Shoe Co.,* 799 F.2d 80 (1986), have imposed a more stringent definition of "willful" behavior. *See Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 308–11 (7th Cir.1986); *E.E.O.C. v. First Citizens Bank,* 758 F.2d 397, 401 (9th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228

(1985) (violation is willful when the employer knew, or should have known, that there was an appreciable possibility that the employees involved were covered by the statutory provisions).

The United States Court of Appeals for the District of Columbia Circuit, in *Laffey v. Northwest Airlines,* 567 F.2d 429 (1976), rejected a definition of "willful" which would require proof of an employer's bad purpose or evil intent, and also rejected the lenient *Jiffy June* "in the picture" standard. While the court did not articulate a definite standard for determining "willful" conduct, it stated:

> We think that at the very least the employer's noncompliance [with the Equal Pay Act] is "willful" when he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt.

567 F.2d at 461–62. (Emphasis added.)

Prior to *Richland Shoe,* which rejected the *Laffey* definition of "willfulness", 486 U.S. at 134, 108 S.Ct. at 1682, the Claims Court in *Hickman v. United States,* 10 Cl.Ct. 550 (1986), applied the standard articulated by the Court of Appeals for the D.C. Circuit in *Laffey, supra,* holding that the definition for determining "willfulness" for purposes of 29 U.S.C. § 255(a) "should mean the absence of significant uncertainty whether the FLSA applies to cover an employee." *Hickman v. United States,* 10 Cl.Ct. at 554.

82–83. The Supreme Court affirmed the Third Circuit's decision.[11]

Accordingly, the issue of "willfulness" will not control the matter of liability, *i.e.,* the non-willful character of a violation of the Equal Pay Act would not defeat recovery, *Laffey v. Northwest Airlines, Inc.,* 567 F.2d at 461, but will determine whether any back pay liability extends from two to three years. *Id.*

### 2. *Liquidated Damages.*

■ An award of liquidated damages for a violation of the Equal Pay Act, 29 U.S.C. § 206(d), is governed by the Fair Labor Standards Act (FLSA). 29 U.S.C. §§ 201–219. Section 216(b) of the FLSA provides in part:

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee * * * affected in the amount of [her] unpaid minimum wages, or [her] unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). When a violation of the Equal Pay Act is found, the presumption is that the aggrieved employee should receive liquidated damages as a matter of right. However, the employer may, pursuant to the provisions of the Portal–to–Portal Act, provide a defense to avoid payment of liquidated damages:

In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201, et seq.], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260. (Brackets in original.)

■ In other words, there is a presumption in favor of the employee receiving liquidated damages. The burden of proof then shifts to the employer, who has "a plain and substantial burden of persuading the court by proof that his failure to obey the statute [Fair Labor Standards Act] was both in good faith [12] and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Rothman v. Publicker Indus., Inc.,* 201 F.2d 618, 620 (3d Cir.1953). The court has the discretion [13] not to award liquidated damages when employer meets this burden of proof. *See, E.E.O.C. v. City of Detroit Health Dep't,* 920 F.2d 355, 357 (6th Cir.1990). However, even if the employer's presentation is persuasive the court may still exercise its discretion to grant liquidated damages totally or partially. *Laffey v. Northwest Airlines,* 567 F.2d 429, 465 (D.C.Cir.1976).[14]

---

**11.** Although *McLaughlin v. Richland Shoe* involved a violation of the overtime and record keeping provisions of the Fair Labor Standards Act, the statute also applies to the Equal Pay Act, 29 U.S.C. § 206(d)(3). *McLaughlin v. Richland Shoe,* 486 U.S. at 131, 108 S.Ct. at 1680.

**12.** The "good faith" allusion in the EPA means "an honest intention to ascertain what the ... Act requires and to act in accordance with it." *Laffey v. Northwest Airlines, Inc.,* 567 F.2d at 429, 464 (D.C.Cir.1976) (citing, *Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 93 (2d Cir.), *cert. denied,* 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953)).

**13.** Any assessment of an employer's good faith or grounds for his belief in the legal propriety of his conduct is necessarily a finding of fact, to be disturbed on appeal only if clearly erroneous. *Laffey v. Northwest Airlines, Inc.,* 567 F.2d at 464.

**14.** *See also, Laffey v. Northwest Airlines,* 567 F.2d 429 (D.C.Cir.1976), in which the court stated:

Congress * * * conferr[ed] the present discretion on the courts to limit or deny liquidated damages if the employer could meet the "substantial burden" of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance. If the employer cannot convince the court in these respects, an award of liquidated damages remains mandatory; and even if the employer's presentation is persuasive the court may still exercise its

## II. *Substantial Equality of Work*

As aforementioned, to prevail, Ms. Ellison must establish the substantial equality of skill, effort and responsibility between her job and the jobs of at least one of the higher paid male comparators. "Skill" includes consideration of such factors as experience, training, education, and ability. 29 C.F.R. § 1620.15(a).[15] "Effort" is concerned with the measurement of the physical or mental exertion needed for the performance of the a job. 29 C.F.R. § 1620.16(a). "Responsibility" is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. 29 C.F.R. § 1620.17(a).

### A. Ellison's Duties at the USMS

Teresa Ellison held the position of Chief of the Managerial Assessment & Development Branch (MAD Branch) in the Administrative Directorate of the U.S. Marshals Service from September 1984 through April 1988.[16] In her capacity as Chief of the MAD Branch she was responsible for the USMS' nationwide supervisory and management training programs, which included administering the USMS Merit Promotion Program management training, and the Fitness in Total Program (FIT), the Supervisory and Management Training Program, the Employee Development Program and the Employee Suggestion Program, Retirement Program and Employee Assistance Program. Joint Stips. 2, 3, 6; Tr. 64–65. She also conducted 5–7 weeks of management training a year for chief deputy and supervisory deputy personnel. Joint Stip. 2, 3.

As head of the Merit Promotion Program, Ms. Ellison developed and presented training on aspects of merit promotion systems, represented management in presentations and negotiations concerning merit promotion, and assisted the USMS National Merit Promotion Board in the development and implementation of merit promotion policy. Joint Stip. 2. Her responsibilities concerning supervisory and management training included conducting training needs analyses, developing (and assisting others to develop) course curricula, outlines, instructional materials and training aids for courses she presented, identifying and selecting instructors for courses, evaluating the effectiveness of the training courses, and advising and representing management regarding these programs. Joint Stip. 3. Her responsibilities in the Employee Suggestion Program involved monitoring the processing of suggestions, recommending action on suggestions, and promoting and advertising the program to encourage participation. Joint Stips. 4, 5. Ms. Ellison also established and administered the USMS' new national FIT Program. She selected FIT coordinators in field offices, coordinated their training, directed and monitored their activities. She also provided support, information and advice to FIT coordinators and participants and developed promotional and motivational materials to encourage participation in the FIT Program. In addition, Ms. Ellison monitored the collection, analysis and reporting of FIT Program data in order to assess the impact of the program's regulations and practices. Joint Stip. 6.

Ms. Ellison testified as to her responsibilities as branch chief of the MAD Branch. Her duties included supervising professional and support staff in the branch, managing the branch's budget and submitting a proposed budget at the request of the Comptroller. Tr. 66.[17] Ms. Ellison has an extensive background in personnel management, statistics and research methodology

___

discretion to grant liquidated damages totally or partially. 567 F.2d at 464–65.

**15.** Skill must be measured in terms of the performance requirements of the job. Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill. 29 C.F.R. § 620.15(a).

**16.** Ms. Ellison was reassigned to the position of Personnel Research Psychologist in the Personnel Management Division in April 1988. Tr. 161–62.

**17.** Plaintiff's Exhibits 101 and 102 constitute proposed budgets for fiscal years 1987 and 1988, respectively. Ms. Ellison testified as to the steps she took to prepare and present the proposed budgets. Tr. 67–68.

and utilized her knowledge of statistics frequently as branch chief of the MAD Branch. Tr. 71–72. She conducted statistical analysis, *i.e.,* she monitored and evaluated programs by using various tracking systems, such as surveys and questionnaires. Tr. 70–71. She also researched legislation, agency directives and legal issues insofar as they impacted on policy decisions and implementation at the USMS. Tr. 72–74. Ms. Ellison frequently dealt with individuals outside of the USMS. She was part of a federal inter-agency fitness task force, along with program managers from other government agencies, such as the FBI, DEA, IRS and Customs, and served on the Inter–Agency Executive Council for Federal Program Managers. Tr. 78–79. She conducted many presentations in connection with these activities. Tr. 79.

During her service with the USMS, Ms. Ellison received several merit awards.[18] Her employment performance appraisals during the time that she served as branch chief of the MAD Branch do not mention that she had any difficulties with any of her first-line supervisors.

## B. Duties of Higher Paid Male Branch Chiefs

In support of her contention that, due to her gender, she was paid at a lower salary grade than her male counterparts, Ms. Ellison identified three higher paid male branch chiefs at USMS whose work was allegedly substantially similar to hers: Peter Paul Mihailoff, Chief of the Supervisory & Management Training Branch; Jack McCrory, Chief of the Policy, Employee Development & Compensation Branch; and Thomas Lane Hurley, Chief of the Employee Health & Assistance Branch. All four of these positions—Ms. Ellison's and those of the three male comparators—were in the USMS Administrative Directorate, all were supervisory and all were in divisions devoted to personnel management and human resources. However, the three male branch chiefs were paid at a higher salary grade—GM 14—while Ms. Ellison was paid at the lower GM–13, after becoming qualified for promotion to the GM–14 level.

The duties and responsibilities of each of the three male comparators, as compared to those of Ms. Ellison's position, were as follows.

### 1. *Peter Paul Mihailoff*

As Chief of the MAD Branch, Ms. Ellison was responsible for the USMS' nationwide supervisory and management training programs until February 1988. At that time, a study conducted by one of the Director's Special Assistants recommended that the Supervisory and Management Training Program (SMT) be elevated to a new level and that a new branch be formed to administer the program. Joint Stip. 11; Tr. 722–724. It was recommended that the individual who headed this new branch have a law enforcement background. Joint Stip. 25; Tr. 723–24. The new SMT Program was transferred to the Training Center in Glynco, Georgia and Peter Paul Mihailoff was selected as branch chief in June 1988. Mr. Mihailoff was hired at a salary grade of GM–14.

In his first six months as branch chief of the SMT Program, Mr. Mihailoff conducted a needs analysis of the USMS supervisory and management training and made training recommendations based on that analysis. Tr. 728, 796. This was the same work performed by Ms. Ellison as part of her duties as chief of the MAD Branch, *i.e.,* she conducted a needs analysis while she administered the supervisory and management training program when it was under the auspices of the MAD Branch. Tr. 75–76, 93–94, 927–28.[19] Mr. Mihailoff

18. *See, infra,* note 25 and accompanying text.

19. Mr. Kupferer, Ms. Ellison's supervisor from April 1987 to April 1988 testified as follows:
Q: She [Ms. Ellison], in fact, during her tenure with you, conducted a fairly lengthy needs analysis of the management and supervisory training program which you in turn forwarded up to your boss, Mr. Mead; is that correct?
A: That's correct.
Q: All right. And in fact, in that analysis she identified some of the kinds of improvements in the system that you later have witnessed in the program Mr. Mihailoff runs at Glynco?; is that correct?

*initially* performed work substantially equal to that performed by Ms. Ellison in her capacity as branch chief of the MAD Branch at a higher salary grade. Under the Equal Pay Act, the equality of work is not determined by duties or responsibilities to be performed in the future. *Strecker v. Grand Fork County Social Servs. Bd.,* 640 F.2d 96, 100 (8th Cir.1980).

Defendant contrasts the work performed by noting that Ms. Ellison lacked the law enforcement background that Mr. Mihailoff possessed and that Mr. Mihailoff's law enforcement background constituted a skill he was able to use in the performance of his job. Def. Post–Trial Reply Brief at pp. 5–9. However, as aforementioned, for purposes of the EPA "skill" must be measured in terms of the performance requirements of the job. The defendant has failed to show that Mr. Mihailoff actually utilized his law enforcement background in the performance of his job duties as Branch Chief of the SMT Branch. The evidence establishes that when Mr. Mihailoff initially assumed the position of branch chief, at a grade level of GM–14, he performed the same duties as Ms. Ellison. A law enforcement background was not a necessary requirement of work actually performed. Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill. 29 C.F.R. § 620.15(a).

Moreover, Ms. Ellison possessed relevant educational qualifications that Mr. Mihailoff did not[20] and she regularly utilized these skills in the performance of her duties as Branch Chief of the MAD Branch.[21] The evidence does not establish that Mr. Mihailoff's law enforcement expe-rience supported a position at a higher salary grade than one held by Ms. Ellison, who possessed higher relevant educational qualifications. These two individuals performed substantially equal work.

For the above stated reasons, the defendant has failed to meet its burden of showing that the wage disparity between Ms. Ellison and Mr. Mihailoff was permissible, *i.e.,* that it was the result of one of the for affirmative defenses enumerated in § 6(d) of the Fair Labor Standards Act of 1938, as amended 29 U.S.C. § 206(d)(1).

### 2. *Jack McCrory*

Mr. McCrory served as chief of the Policies, Employee Development and Compensation branch (PED & C) of the USMS. Mr. McCrory was paid at salary grade level 14. This branch existed from 1982 through 1984. When it was abolished, Ms. Ellison assumed responsibility for the Supervisory and Management Training and Employee Development Program, the Employee Suggestion Program, and Training Officer duties from Mr. McCrory. Joint Stip. 3.

Defendant does not dispute that Ms. Ellison assumed responsibility for these programs after the abolition of the PED & C Branch. However, it contends that Mr. McCrory had certain responsibilities in his position, *i.e.,* responsibility for classification issues, management analysis, manpower allocation, pay administration, and legislative review functions that Ms. Ellison did not. Defendant thus asserts that the salary grade for the two branch chief positions differed because Mr. McCrory had responsibility for compensation and manpower allocation issues, while Ms. Ellison allegedly did not.

---

A: That's correct.
Tr. at 893.

**20.** Ms. Ellison received a Bachelor's degree in Psychology and Business Administration from Clemson University and she completed two years of graduate work at Virginia Tech in Industrial and Organizational Psychology. Tr. 58–59. She had extensive graduate course work in the areas of personnel measurement, statistics and research methodology. Tr. 71.

Prior to law enforcement work, Mr. Mihailoff attained neither an undergraduate nor graduate degree. He attended Columbia University for a period of time, but he decided instead to pursue a theological career. He left Columbia to become a seminarian at Loyola College, which had a program with St. Vladimir's Orthodox Theological Seminary. He then went from St. Vladimir's to Holy Trinity Orthodox Monastery and became a brother in a monastery. Tr. 815.

**21.** For example, Ms. Ellison testified that she has an extensive background in personnel management, statistics and research methodology and utilized her knowledge of statistics frequently as branch chief of the MAD Branch. Tr. 71–72.

The relevant issue, however, is not whether the two positions are different, but whether the differences are substantial so as to justify a pay differential. Difference in subject matter does not render jobs unequal if the tasks involved are the same. *See, Spaulding v. University of Washington,* 740 F.2d 686, 697 (9th Cir.1984) (court rejected employer's contention that university jobs from different disciplines could not be substantially equal and instructed that proper resolution of each case necessarily depends on the actual content of the job); *Cayce v. Adams,* 439 F.Supp. 606 (D.C.D.C.1977); *Ottaviani v. State University of New York,* 679 F.Supp. 288 (S.D.N.Y.1988), *aff'd,* 875 F.2d 365 (2d Cir. 1989).

Mr. McCrory's responsibilities as PED & C chief included, *inter alia,* drafting legislation related to personnel matters, acting as an agency representative on inter-agency councils. Tr. 675–676. He administered pay policy for approximately 2,000 USMS employees Tr. 669, and compiled a personnel handbook and published a personnel management handbook. Tr. 674–75, 678. He testified that 30–40 percent of his time was devoted to compensation and classification matters, and 25 percent was devoted to management training. Tr. 677, 687.

Defendant argues that Ms. Ellison did not perform the same tasks as Mr. McCrory and contends that the composition of Ms. Ellison's workload was "substantially different" from his workload. Def. Post-Trial Brief, at 12–13. Defendant's argument is not persuasive. The two jobs do not have to be identical in every respect in order to be substantially equal for purposes of the Equal Pay Act. *Goodrich v. International Bhd. of Elec. Workers,* 815 F.2d at 1524. As aforementioned, the proper inquiry under the Equal Pay Act is the substantial equality of the jobs, *i.e.,* comparative skill, effort and responsibility required by the jobs. Difference in subject matter does not render jobs unequal if the tasks involved are the same. *See Spaulding v. University of Washington,* 740 F.2d at 697.

There was a significant overlap between the substantive areas of responsibility of the two jobs. Both Ms. Ellison and Mr. McCrory were at some point responsible for the Supervisory & Management Training Program (Tr. 91–94, 103, 686), the Employee Suggestion Program (Tr. 149–51, 686), the employee development/external training program (Tr. 148–690), and merit promotion (Tr. 104–108, 381, 382, 683–85). Ms. Ellison assumed Mr. McCrory's responsibilities for personnel management policy matters (Tr. 689) and compensation matters [22] when his branch was abolished in 1984. (Tr. 689).

A comparison of Ms. Ellison's responsibilities with those of Mr. McCrory's reveals a minimal substantive difference. For example, in managing the programs in their respective branches, both were responsible for preparing and submitting budget proposals to the Division Director and for keeping branch activities within budgetary limitations. Tr. 67–69, 713–14; Pl. Exs. 101, 102. When outside contractors were used to assist branch functions, both Ms. Ellison and Mr. McCrory were responsible for oversight of the contract process. Tr. 95, 711–12. Both prepared manuals, handbooks and other materials describing the substance of their personnel management programs. Tr. 74–75, 83–84, 673–75. Ms. Ellison and Mr. McCrory were considered experts by the USMS in their respective specialties, *i.e.,* Ms. Ellison on merit promotion issues and Mr. McCrory on FLSA pay issues. Tr. 82, 240–41, 383, 673–76. Both commented on legislation and regulations in their respective areas of expertise, testified in court about their programs if necessary, and served on inter-agency task forces. Tr. 73–74, 78–79, 673–676.

The comparative skill, effort and responsibility required by the two jobs is the

---

**22.** Before his branch was abolished, Mr. McCrory was working on a major compensation-related project involving a proposal to the Office of Personnel Management to change the marshals' job standards. OPM rejected the standards Mr. McCrory prepared. Tr. 670–73. Ms. Ellison assumed responsibility for this project when Mr. McCrory left as branch chief and she successfully completed the assignment. Tr. 239–40.

same. Furthermore, defendant's attempt to differentiate the two positions by comparing each to a set percentage of time devoted to particular tasks is a flawed analysis. "[T]he amounts of time which employees spend in the performance of different duties are not the sole criteria. * * * [A] general standard to determine equality of jobs cannot be set up solely on the basis of a percentage of time." 29 C.F.R. § 1620.14(c).

### 3. Thomas Lane Hurley

Mr. Hurley served as chief of the Employee Health & Assistance Branch (EHA) from April 1988 through March 1990. The Employee Health and Assistance Branch was created in 1988. Mr. Hurley was appointed branch chief of the Employee Health and Assistance Branch in July 1988 at grade level GM–14. He was responsible for administering three USMS programs: the Fitness in Total Program, the Employee Assistance Program, and the retirement program. Pl.Ex. 59. All three programs in the new branch came from plaintiff's MAD branch. Joint Stips. 6, 14, 2.[23] The

salary grade level was based on the duties and responsibilities set forth in the written position description (Plf. Exhibit 59) prepared for the job as required by federal civil service laws. *See, e.g.,* Federal Personnel Manual (FPM), Ch. 312, Subch. 3, 3–2(b). The position description of the new position was based on Ms. Ellison's responsibilities when she managed those programs. Tr. 141–42.

Defendant contends that Mr. Hurley performed duties that Ms. Ellison did not. For example, Mr. Hurley acted as the USMS liaison and overseer for the national contractor who provided counselling and other services to the EHA branch. Tr. 608; *see also,* Defendant's Post–Trial Brief at 33. He also implemented and performed duties in connection with the Post Traumatic Syndrome (PTS) component of the EHA program, attended debriefings, and presumably spent 85% of his workdays and 1–1.5 hours of his evenings involved in the PTS program and other EHA issues. Tr. 622–25; 633.[24] Mr. Hurley's experience in

**23.** The new position as Branch Chief of the EHA was announced as a salary grade 14. The grade level was based on the duties in the written position description, as required by federal civil service laws. *See, e.g.,* Federal Personnel Manual (FPM), Ch. 312, Subch. 3, 3–2. The job description for the new position of EHA branch chief, eventually filled by Mr. Hurley, was written based on Ms. Ellison's duties and responsibilities in managing the three programs. Tr. 141–42; *see also,* Plaintiff's Post–Trial Brief at 12–13. Job descriptions alone are not determinative of equal work, rather the court must weigh the nature of the actual duties performed by two employees. *E.E.O.C. v. Mercy Hosp.,* 709 F.2d 1195, 1197 (7th Cir.1983). However, although job descriptions are not determinative, they are highly probative of equal work because "one would expect that actual responsibilities would, to some extent, conform to a job description." *Epstein v. Secretary, U.S. Dep't of Treasury,* 739 F.2d 274, 277 n. 6 (7th Cir.1984).

**24.** Mr. Hurley has a Master of Science and Ph.D. degrees in government from Florida State University, a Bachelor of Science in Political Science from the University of North Carolina at Charlotte, and an Associates degree from Lees and Frey College. Tr. 604–605 He took a number of training courses in the area of criminal justice outside of the university setting. These included "police academy training, special classes in police work, law enforcement, criminal investigations, patrol officer training,

tactical training, street survival training, terrorism training, counter terrorism training." Tr. 605.

Mr. Hurley testified that he was involved with post traumatic stress intervention while he was with the Albuquerque Police Department.

Q: When you were with the Albuquerque Police Department, did you have any involvement with post traumatic stress intervention?
A: Yes. We did—that was in the late '80s, and so we were sort of beginning the development of those kinds of ideas then. And so part of the programs that I directed at the time developed what was then a pure counseling program, but which is known today as the post traumatic stress programs. I developed a film, developed a peer counseling program, instituted regular meeting[s], self-help groups, those kind of things.
Tr. 606.

However, Mr. Hurley has had no formal education or training in the treatment of Post Traumatic Stress Syndrome that would classify him as a counsellor.

Q: Now, what background do you have in connection with post traumatic stress disorder?
A: Going back to the days with the Albuquerque Police Department and having been in uniform and down the street there, I did a lot of self-education.
Q: When you say self-education, what does that mean?

post traumatic stress syndrome was basically limited to organizing meetings and support groups, and developing programs designed to increase general awareness and provide a support system for individuals who suffer from the disorder. For purposes of an EPA analysis, his "experience" with PTS alone does not justify the higher salary grade. The skill, responsibility and effort involved in his PTS activities is substantially equal to the skill, effort and responsibility involved in Ms. Ellison's duties.

The fact that Mr. Hurley focused on employee assistance and developed a PTS program for the Marshal Service while Ms. Ellison focused on the FIT program did not render the jobs unequal. "The controlling factor under the Equal Pay Act is job content—the actual duties the respective employees are called upon to perform." *Pearce v. Wichita County, etc., Hosp. Bd.,* 590 F.2d at 133. Furthermore, the fact that Mr. Hurley was *hired* at GM–14 shows that the determination of his salary grade could not have taken into consideration any developments or advances that he implemented with respect to the EHA program. At the time he was hired, the job description was almost identical to that of Ms. Ellison's because he was taking over programs that she had administered. He, like Mr. Mihailoff, initially performed work substantially equal to that of Ms. Ellison

A: Well, I attended development classes or attended training classes. I went to other programs to try to understand a little bit about this new—what was then a new phenomenon. * * *
Tr. 613.

25. Ms. Ellison has propounded ample evidence to show that during her tenure with the USMS, she was praised as an outstanding employee and received high ratings in employee evaluations. *See, e.g.,* Plf.Exs. 3, 4, 5 (materials involving Ms. Ellison's nomination for the Women's Executive Leadership Program, in which Mr. Holecko states that "[s]imply put, Teri Ellison is an outstanding employee."); Pl.Ex. 6 (letter from Mr. Morris to Ms. Ellison in which he wrote that her "nomination by the Department [to the Women's Leadership Program] is * * * recognition of the high esteem in which you are held at the United States Marshal Service."); Plf.Ex. 8 (formal employee rating of the 1985 period, in which Mr. Holecko rates Ms. Ellison as out-

and, under the EPA, the equality of work is not determined by duties or responsibilities to be performed in the future. Ms. Ellison's work was substantially equal to that of Mr. Hurley.

## C. Defendant's Affirmative Defense

Ms. Ellison became chief of the MAD Branch in October 1984. Joint Stips. 1, 3, 6. She became eligible for a promotion in October 1985, after satisfying the time-in-grade requirements. Therefore, as of that date there were no technical obstacles to her promotion to a salary grade of GM–14. Tr. 526, 944–46. However, the Director, Mr. Morris failed to promote Ms. Ellison in December 1986 and December 1987, even though she was technically eligible for it and had consistently received outstanding performance ratings.[25] The defendant contends that its failure to promote Ms. Ellison was "due to a factor other than sex" and thus the wage differential fell under the last of the four exceptions enumerated in the Equal Pay Act. *See,* 29 U.S.C. § 206(d). To prevail, the defendant must show by a preponderance of the evidence that the wage differential falls under one of the four exceptions to the EPA. *Corning Glass Works v. Brennan,* 417 U.S. at 196–97, 94 S.Ct. at 2229 (1974).

The defendant relies on the Supreme Court's decision in *County of Wash-*

standing); Plf.Ex. 10 (Knowledge, Skills & Abilities evaluation by Mr. Mead covering the period 1982 through 1986 in which Mr. Mead states, *inter alia,* "Let me begin by stating that Ms. Ellison is an extremely rare exception to my basic belief that no employee is truly outstanding."). *See, also,* Plf.Exs. 11, 12, 13, 14, 22, 27, 28, 31, 34, 35, 44, 45, 46, 47, 48, 49, 50, 51, 53, 106, 107, 108, 109. Furthermore, in September of 1986, Ms. Ellison was awarded the Director's Meritorious Service Award. Plf.Ex. 36. She was handed this award by Mr. Morris at a formal awards ceremony. Tr. at 524. Mr. Morris conceded that this award is one of the highest awards given to personnel in the USMS, that it is given to only a handful of employees annually, and that Ms. Ellison was deserving of the award. Tr. at 523–524. Mr. Morris presented Ms. Ellison this distinguished award in September 1986, which he acknowledged was well-deserved, while he failed to endorse her promotion before the Career Development Board in December 1986.

*ington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), in support of its contention that its failure to upgrade Ms. Ellison to a GM–14 was based on gender-neutral business reasons. Mr. Morris claims that the reason he did not approve Ms. Ellison's promotion to a GM–14 was because of her disloyalty to her immediate supervisors. Tr. 520–21. *See,* Defendant's Post–Trial Brief, filed June 13, 1991, at 41. A review of the evidence propounded at trial reveals that this contention was not established. There is no proof that any of Ms. Ellison's supervisors, Mr. Holecko, Mr. Kupferer or Mr. Odom, actually went to Mr. Morris with complaints about Ms. Ellison's disloyalty or about her performance as the MAD branch chief.[26] Therefore, as none of these supervisors complained directly to Mr. Morris on the record about their alleged difficulties with Ms. Ellison[27], it is not credible that Ms. Ellison's working relationship with her supervisors was so unsatisfactory that this alone would prompt Mr. Morris to maintain plaintiff in a grade lower than other equivalent branch chiefs, by denying her promotion to GM–14. Defendant further relies on the court's statement in *Kouba v. Allstate Co.,* 691 F.2d 873, 877 (9th Cir.1982) that exception (iv), the "due to any factor other than sex" exception to the EPA, is a "broad general exception" and argues that its failure to promote Ms. Ellison was due to valid "business reasons" that "include those that measure the value of an employee's job performance to his or her employer." *See,* Def. Post–Trial Brief, filed June 12, 1991, at p. 41. However, an employer cannot use a factor which causes a wage differential between male and female employees absent an acceptable business reason. *Kouba v. Allstate Ins. Co.,* 691 F.2d at 876.[28] The employer must use the factor reasonably in light of the employer's stated purpose as well as its other practices. *Id.*[29]

■ In the case at bar, the stated "business reason" for the wage differential "was based upon Ms. Ellison's inability to forge effective working relationships." Def. Post–Trial Brief at 41. However, the evidence supports a conclusion that the underlying basis for the supervisors' reactions to certain of Ms. Ellison's activities was gender related. The record contains sufficient inappropriate comments and incidents which reflect gender-based perceptions on the part of key personnel. Certain incidents clearly reflect a "disparaging" and "disrespectful" attitude on the part of several members of the USMS toward plaintiff and her female associates such as to have an adverse impact on working relationships. For example: the then Director

**26.** Mr. Odom testified that he never discussed his working relationship with Ms. Ellison with Mr. Morris, although he did share the "envelope incident" with Mr. Morris' secretary. Tr. 842, 857. Mr. Kupferer also testified that he never discussed any concerns about Ms. Ellison with Mr. Morris. Tr. 885, 894. Mr. Holecko, similarly testified that he did not discuss any problems that he was having with Ms. Ellison with Mr. Morris, but that he did discuss these matters with Mr. Mead and Ms. Ellison. Tr. 402.

**27.** Mr. Morris testified that Ms. Ellison's inability to "forge a relationship" with three supervisors in a row was conveyed to him via "complaints in the hall and that sort of thing. Concern was expressed to members of my immediate staff." Tr. 528.

**28.** In relevant context, the Court of Appeals for the Ninth Circuit stated:

The Equal Pay Act concerns business practices. It would be nonsensical to sanction the use of a factor that rests on some consideration unrelated to business. An employer thus cannot use a factor which causes a wage differential between male and female employees absent an acceptable business reason. Conversely, a factor used to effectuate some business policy is not prohibited simply because a wage differential results.

Even with a business-related requirement, an employer might assert some business reason as a pretext for a discriminatory objective. * * * The ability of courts to protect against such abuse is somewhat limited however. The Equal Pay Act entrusts employers, not judges, with making the often uncertain decision of how to accomplish business objectives. * * * We have found no authority giving guidance on the proper judicial inquiry absent direct evidence of discriminatory intent. A pragmatic standard, which protects against abuse yet accommodates employer discretion, is that *the employer must use the factor reasonably in light of the employer's stated purpose as well as its other practices.* * * *. *Id.* at 876–77. (Emphasis added.)

**29.** *See also, supra,* p. 487.

referred to Ms. Ellison and her staff (which was comprised entirely of women) as a "bunch of cheerleaders" (Tr. 157); there was an incident during official travel in Dallas when another supervisor purchased two roses, handed one to Teresa Ellison and her associate Carol Hallowell, stating that "roses are God's second most beautiful creation next to woman" (Tr. 167, 280); another supervisor commented to Ms. Ellison that he was surprised that she had gotten along so well at the USMS because she was 24 and had long, straight hair (Tr. 166), made comments to one of Ms. Ellison's female associates concerning her looks and her legs (Tr. 279), told this associate prior to a presentation she was giving that she "pull her hair back" and "try not to giggle" (Tr. 280, 370–71) and during this associate's job interview, he made reference to the fact the USMS was a predominantly male agency and asked whether she would have any problem working there (Tr. 277–78); another supervisor ordered a female associate in Ms. Ellison's branch during an official function to sit at the head table next to Mr. Morris, who stated to her that "what was the purpose of being the director of the Marshals Service if you couldn't have a beautiful young woman sit next to you" (Tr. 305), and orchestrated a spoof "role play" video in 1987, which depicted a federal court judge meeting with a female Marshal that clearly implied the Marshal would provide sexual services for the judge as part of her job. (Tr. 170–72). It is most relevant that this supervisor was merely advised of the "inappropriateness" of the sexually insulting spoof video but was never reprimanded for putting it together (Tr. 474), while Ms. Ellison was denied a promotion allegedly because of adverse relationships with supervisors based, apparently in one instance, upon an unsubstantiated belief that she instigated a much less serious incident, which involved only overly literal compliance by her staff with a supervisor's order to inspect correspondence.[30] Furthermore, even assuming, *arguendo*, that the defendant's assertions were correct, *i.e.*, that Ms. Ellison did not "forge effective working relationships" with her immediate supervisors, the defendant has not shown how this adversely affected her job performance. To the contrary, Ms. Ellison received outstanding job performance ratings and a Merit Award during her tenure as the MAD Branch Chief.[31] Therefore, the "business reasons" given by the USMS do not reasonably explain or justify its failure to promote Ms. Ellison to a GM–14. Consequently, defendant has failed to show by a preponderance of the evidence that the wage differential fell within one of the four exceptions to the Equal Pay Act, *i.e.*, that it was based "on any factor other than sex." 29 U.S.C. § 206(d).

D. Conclusion: Ms. Ellison's Occupational Duties were Substantially Equal to her Male Counterparts & Wage Differential was not Reasonably Justified

As aforementioned, a wage differential is justified only if it compensates for an appreciable variation in skill effort or responsibility between otherwise comparable work activities. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 449 (D.C.Cir.1976). "[I]nsubstantial or minor differences in the degree or amount of skill or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. § 800.122.

Applying case law and agency regulations to the instant case, it is concluded that the differences in occupational duties proffered by the USMS to justify the higher wage paid to the male branch chiefs are minor. Ms. Ellison's has shown that the effort, skill and responsibility of her job as branch chief of the MAD Branch was substantially equal to the jobs held by her three male branch chief comparators and that she was paid at a lower salary grade than her male counterparts. Defendant has failed to prove by a preponderance of the evidence that the wage differential was due to one of the four exceptions enumerated in Equal Pay Act. Therefore, the plain-

---

**30.** *See supra* note 4.

**31.** *See supra* note 25.

tiff has established a violation of the Equal Pay Act and is entitled to appropriate relief.

To determine the appropriate remedy under the Equal Pay Act, it must be determined 1) whether the defendant's violations were "willful", thus extending the statute of limitations and back pay recovery period to three years under 29 U.S.C. § 255(a); and 2) whether liquidated damages will be awarded.

III. *Remediation of Equal Pay Act Violation*

 A. Back Pay Recovery Under the Equal Pay Act: Willful Violation

The Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) held that, for purposes of 29 U.S.C. 255(a), a violation of the relevant sections of the Fair Labor Standards Act is willful "if the employer *knew* or *showed reckless disregard* for the matter of whether its conduct was prohibited by the FLSA." 486 U.S. at 133, 108 S.Ct. at 1681. (Emphasis added.)[32] Applying this standard to the case at bar, it is clear that the defendant showed a reckless disregard of whether its conduct was prohibited by the Equal Pay Act and thus acted willfully in failing to pay Ms. Ellison a salary equal to that paid her male counterparts.

 Ms. Ellison's requests for promotion were denied by Stanley Morris, Director of the USMS. Although Mr. Morris's stated reason for refusing to promote Ms. Ellison was her alleged lack of loyalty, the evidence does not support this either as the actual or a valid reason. The totality of the evidence presented demonstrates that Mr. Morris, and indeed several members of the USMS, had a disparaging attitude regarding Ms. Ellison divorced from her job performance which was consistently given high marks. The allegations of "disloyalty" or "disrespect" put forth by defendant were a convenient pretext for denying her a promotion. This is shown, for example, by the absence of any action to stop Mr. Mead from dealing directly with Ms. Ellison. If this had truly been considered a problem serious enough to preclude a promotion for Ms. Ellison, Mr. Mead would undoubtedly have been so admonished or instructed. *See* n. 6, *supra.* Although Mr. Morris, *et al.*, attempted to downplay the significance of Ms. Ellison's accomplishments and awards, it is clear that her competence as MAD Branch Chief was never drawn into question, despite an alleged "disloyalty" to her immediate supervisors. Nor did any of her immediate supervisors, with whom she allegedly did not get along, actually complain about her on the record directly to Mr. Morris, give her a poor performance rating, or in any other way indicate their displeasure with her work.

The incidents and comments discussed in Part III.C., *supra*, support the conclusion that her key supervisors did not objectively credit Ms. Ellison's skills, responsibilities and accomplishments as a USMS branch chief when it came to promotion consideration, stemming from their perceptions of her as a woman supervising an all-female staff and, as a result, she was not promoted to a GM–14 despite an excellent work record.[33] This is illustrated by the disparate treatment reflected in a supervisor withdrawing a promotion recommendation for Ms. Ellison based upon her assumed involvement in the "letter incident" whereas the male supervisor who developed the sexually insulting spoof video was merely advised of its inappropriateness with no monetary consequences involved.

In light of all the evidence, the Marshals Service demonstrated a reckless disregard as to its Equal Pay Act responsibilities with respect to promoting Ms. Ellison to a GM–14 such that it constitutes a "willful" viola-

---

**32.** *See, supra,* Part I.B.1 and accompanying text.

**33.** From 1984 through April 1988, sixteen individuals held positions as Branch Chief: 12 men and 4 women. Only 5 of these individuals, 2 men and 3 women, were at the grade 13 level. (Of these, both of the men and one of the women were promoted to GM–14 by the fall of 1988.

tion entitling plaintiff to back pay from October 1985.

### B. Liquidated Damages: Good Faith Requirement

The award of liquidated damages is mandatory upon a showing of an Equal Pay Act violation. To escape payment of liquidated damages, the defendant must convince the court that its failure to comply was in good faith and that it had reasonable grounds for believing that its actions were not a violation of the EPA. Even if the defendant meets this substantial burden, the court may still exercise its discretion to grant liquidated damages totally or partially.[34]

Defendant failed to meet its burden of establishing that its failure to promote Ms. Ellison to a salary grade comparable to her male counterparts was in good faith. No valid reason for the failure to promote Ms. Ellison to the GM-14 grade held by other branch chiefs performing substantially equal work has been presented. The "business reason" put forth as a justification, *i.e.*, Ms. Ellison's asserted "disloyalty" involved in an inability to get along with her first-line supervisors fails because her performance was consistently rated outstanding in the contemporaneous records, which are given more weight than subsequent testimony by the persons concerned, *Montgomery Coca-Cola Bottling Co. v. United States*, 222 Ct.Cl. 356, 375, 615 F.2d 1318, 1328 (1980), and any friction with supervisors had a substantial element

of gender motivation. The evidence cannot support a finding that the willful failure to promote plaintiff constituted good faith action such that the USMS had reasonable grounds for believing that no EPA violation took place.[35] An award of liquidated damages in an amount equal to the back pay is therefore mandatory.

### CONCLUSION

For the above stated reasons, the plaintiff has established a violation of the Equal Pay Act. The defendant failed to meet its burden of proving by a preponderance of the evidence that the wage differential was due to factors other than gender. Furthermore, after reviewing the parties' pleadings, briefs and exhibits, and after weighing the credibility of the witnesses, it is concluded 1) that the actions of the USMS in maintaining a wage differential were willful because the USMS acted with a reckless disregard as to whether its conduct was prohibited by the Equal Pay Act; and 2) that the USMS did not establish that its noncompliance was in good faith predicated upon a reasonable belief that it was in compliance of the Equal Pay Act.

Accordingly, Ms. Ellison is entitled to recover for the defendant's EPA violations for a period of three years prior to the filing of this action. She is also entitled to an additional equal amount as liquidated damages and to attorney's fees.

The parties are directed to confer, develop and, within 45 days, file a stipulation setting forth the relevant amounts, *i.e.*, the

---

34. *See, supra,* Part I.B.2.

35. *See also E.E.O.C. v. City of Detroit Health Dept.,* 920 F.2d 355 (6th Cir.1990). In this case the E.E.O.C. appealed the decision of the district court denying the Equal Pay Act plaintiffs liquidated damages under 29 U.S.C. § 216(b). The E.E.O.C. contended that because the jury determined that the defendant willfully violated the Equal Pay Act, the district judge was precluded from exercising discretion not to award liquidated damages. The Court of Appeals for the Sixth Circuit agreed with the E.E.O.C. and stated:

> [T]he finding of a willful violation by the jury is inconsistent with the implicit finding by the judge that the [defendant] City acted in good faith and with reasonable grounds for believing that its acts or omissions were not a

violation of the Equal Pay Act. In [*McLaughlin v.*] *Richland Shoe* [486 U.S. 128, 108 S.Ct. 1677], the Supreme Court held that for purposes of determining whether the two or three year statute of limitations should be applied, the three year statute applies if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute * * *." *Id.,* 486 U.S. at 133, 108 S.Ct. at 1681. * * * It appears to us that this finding by the jury is absolutely inconsistent with the implicit finding by the district court that the City had acted in good faith and with reasonable grounds for believing that its acts or omissions were not a violation of the Equal Pay Act.

920 F.2d at 358. (Brackets added.)

computation of back pay, liquidated damages and attorney fees, so that a final judgment may thereafter be promptly entered.