Danielle F. JENKINS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–848 C.

United States Court of Federal Claims.

April 28, 2000.

Danielle F. Jenkins, Howard, OH, pro se.

Sean H. Lane, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Assistant Director, U.S. Department of Justice, Washington, DC, for defendant. Major Jerry M. Lang, Air Force Legal Services Agency, Arlington, VA, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiff's Complaint in this matter alleges a violation of the Equal Pay Act, 29 U.S.C. § 206(d) (1994) (the Act) by defendant. Plaintiff asserts that she was paid less than a male co-worker for performing substantially equal work.

On November 24, 1993, plaintiff filed a complaint in the United States District Court for the Southern District of Ohio (district court) asserting violations of Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination and Employment Act of 1967 (ADEA), § 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), and the Equal Pay Act. *Jenkins v. Widnall*, No. 2:93–CV–1201 (S.D. Ohio filed Nov. 24, 1993). The district court dismissed plaintiff's claims under Title VII, the ADEA, and the Rehabilitation Act as untimely. The district court denied a motion by the government for summary judgment on plaintiff's Equal Pay Act claim. *See* District Court Order filed November 30, 1995. The district court later determined that because plaintiff's claim might exceed

the $10,000 statutory limit under the little Tucker Act, the case must be transferred to this court. *See* District Court Orders filed May 20, 1998 and June 10, 1998; *see also* 28 U.S.C. § 1346(a)(2) (1994).

After receiving the case, this court held a status conference with the parties. The court declined to entertain another proposed motion for summary judgment by the government and issued an order stating that the determinations made by the district court stand as the law of the case. *See* Order filed April 5, 1999 (citing *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). This court then severed the claims that had been dismissed by the district court and issued pretrial orders in the Equal Pay Act claim. *See* Orders filed April 5, April 15, May 7 and June 9, 1999. Plaintiff's Equal Pay Act claim is now before the court following a trial on the merits.

## I. Background

The setting for the events that give rise to this case is the Aerospace Guidance and Metrology Center (AGMC) at the Newark Air Force Base, Ohio.[1] The AGMC was established in 1962 to "maintain the guidance systems and precise calibration of new, high-tech Air Force equipment." Aaron Renenger, *Ceremony ends 35 years of service at Newark AFB* (visited Apr. 24, 2000) <http://www.af.mil/news/Sep1996/n19960926_960977.html> (Renenger). The AGMC's first repair activities involved Atlas and Minuteman missile guidance systems. *See id.* In 1965, the AGMC's work expanded to include aircraft navigation systems. *See id.* During the Cold War, the AGMC played a

role in maintaining the balance of nuclear power by keeping Minuteman and Peacekeeper missiles in a constant alert status. *See id.*

The period of time relevant to this matter is November 1990 until plaintiff's retirement in March 1993 (the relevant time period).[2] During the relevant time period, both plaintiff and David G. Morgan, the male co-worker with whose job duties plaintiff compares her job duties, worked in the Directorate of Maintenance (the directorate), which is a subdivision of the AGMC. Within the Directorate of Maintenance, plaintiff and Mr. Morgan worked in the Product Engineering Division (engineering division). Among other things, the engineering division "provide[d] engineering support and surveillance of AGMC repaired inertial navigation and guidance systems, subsystems and instruments." *See* Plaintiff's Exhibit 1 at p. 9. The engineering division also "provide[d] software engineering and programming support for all AGMC automatic test equipment (ATE)." *See id.*

In 1993, after the AGMC had been operating at Newark Air Force Base for more than 30 years, the Realignment and Closure Commission recommended its closure. *See* Renenger, *supra.* After a period of downsizing, the AGMC officially closed on September 30, 1996. *See id.*

## II. Discussion

### A. Equal Pay Act Generally

The Equal Pay Act was enacted in 1963 as an amendment to the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1994). *See Elli-*

1. Unless otherwise noted, statements of fact throughout this opinion are taken from the parties' Preliminary Joint Stipulation of Facts, filed with the court on August 4, 1999, and each party's proposed findings of fact as ruled on by the court at the pre-trial conference and memorialized in an order filed by the court on October 26, 1999.

2. To determine the relevant time period, the court refers to the statute of limitations provision of the Fair Labor Standards Act which provides that an action "may be commenced within two years after the cause of action accrued, and ... shall be forever barred unless commenced within

two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a) (1994). In order to "secure the just, speedy, and inexpensive determination" of the action, Rule of the Court of Federal Claims 1(a)(2), the court heard testimony at trial on the period three years prior to the date of plaintiff's complaint in the district court, recognizing that evidence relating to the period more than two years prior to plaintiff's complaint would be relevant only if the court found a "willful violation" of the Act.

*son v. United States,* 25 Cl.Ct. 481, 486 (1992). The "fundamental purpose of the Act was to remedy disparities in pay arising from traditional concepts of gender." *Id.* (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)).

■ The Equal Pay Act provides in pertinent part:

No employer ... shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex ....

29 U.S.C. § 206(d)(1). As can be seen from the plain language of the statute, it is unnecessary for plaintiff to establish that the reason for the disparity in pay between herself and the comparable male employee is the result of a sex bias. *See Molden v. United States,* 11 Cl.Ct. 604, 610 (1987). It is also unnecessary for plaintiff to show that a disparity in wages is the result of a discriminatory practice on the part of defendant.[3] *See id.* at 610–11.

■ To establish a prima facie case under the Equal Pay Act, plaintiff must show that her employer, the United States, paid a male employee higher wages than plaintiff for work "requir[ing] similar skill[ ], effort, and responsibilit[ies] under similar working conditions." *See id.; see also Corning Glass Works,* 417 U.S. at 195, 94 S.Ct. 2223; *Ellison,* 25 Cl.Ct. at .486. The parties are in agreement that the legal test is not, as the language of the statute might appear to sug-

gest, whether plaintiff and Mr. Morgan were performing identical work. *See* Joint Statement of Issues of Fact and Law (Joint Statement) at 1. The test is whether the work performed by plaintiff and the comparable male employee is "substantially equal." *See* 26 C.F.R. § 1620.13(a); *see also* Joint Statement at 1.

In comparing the employees' jobs, the court's focus must be on the primary duties of each job. *See Ellison,* 25 Cl.Ct. at 487 (citing *Goodrich v. International Bhd. of Elec. Workers,* 815 F.2d 1519, 1524 (D.C.Cir. 1987)). The application of the Equal Pay Act is not avoided by minor or insubstantial differences in the amount of skill, effort, or responsibility required of the two jobs. *See id.* (citing 29 C.F.R. § 1620.14(a) (1999)). The focus of the inquiry is on actual duties performed. *See id.* (citing *Pearce v. Wichita County, etc., Hosp. Bd.,* 590 F.2d 128, 133 (5th Cir.1979)).

### B. Uncontested Elements of Plaintiff's Prima Facie Case

The first element of the prima facie case plaintiff must establish is that her employer is covered by the Act. Defendant does not dispute that plaintiff's employer, the United States Air Force, is covered by the Equal Pay Act. Following the 1974 amendments to the Fair Labor Standards Act, the Act applies to employees of federal, state, and local governments. *See* 29 U.S.C. § 203(e)(2); *see also Kennamore v. Alabama A & M Univ.,* 1991 WL 350047, *6 (N.D.Ala.1991).

As the second element of her prima facie case, plaintiff must establish that she was paid lower wages than the comparable male employee. The male employee to whom plaintiff compares herself is David G. Morgan. It is undisputed that Mr. Morgan received a higher salary than plaintiff. In their joint stipulation, plaintiff and defendant

---

3. Once plaintiff has established a prima facie case, the burden shifts to defendant to establish the existence of one of the four statutory exceptions to the Equal Pay Act as a defense. *See Ellison,* 25 Cl.Ct. at 487 (citing *Corning Glass Works,* 417 U.S. at 196–97, 94 S.Ct. 2223). In asserting that a wage disparity is based on a "factor other than sex," defendant carries a

heavy burden. *See id.* (citing *Brennan v. Owensboro–Daviess County Hosp.,* 523 F.2d 1013, 1031 (6th Cir.1975)). "A wage differential is justified only if it compensates for an appreciable variation in skill, effort, or responsibility between otherwise comparable job work activities." *See id.* (citing *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1083 (D.C.Cir.1984)).

stated, "During the time period relevant to this lawsuit … Ms. Jenkins' salary grade was GS–7, and she was paid less than Mr. Morgan, whose salary grade was GS–11." Preliminary Joint Stip. of Facts at ¶ 4. At the time of Ms. Jenkins' retirement in March 1993, her annual salary was approximately $29,530. *Id.* at ¶ 1. Mr. Morgan's annual salary at that time was approximately $36,986. *Id.* at ¶ 3.

### C. The Contested Matter: Equality of Work

The Act requires plaintiff to prove that she and the comparable male employee performed "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." [4] 29 U.S.C. § 206(d)(1). This is the portion of plaintiff's prima facie case that was the focus of trial. To evaluate whether the positions require equal skill, the court shall consider such factors as "experience, training, education, and ability." 29 C.F.R. § 1620.15(a) (1999). Skill must be measured in terms of the performance requirements of a job. *Id.* Determining equal effort involves "the measurement of the physical or mental exertion needed for the performance of a job." 29 C.F.R. § 1620.16(a). It encompasses the total job requirements. *See id.* The occasional performance of an activity which may require extra exertion, either physically or mentally, is not enough to establish the existence of unequal effort. *See* 29 C.F.R. § 1620.16(b). "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a).

### 1. Plaintiff's Job Duties at Newark Air Force Base

Plaintiff began working at the Newark Air Force Base in June 1966.[5] She began her employment at the base as a Clerk–Stenographer, General Schedule (GS) grade 3. In November of 1990, the start of the relevant time period, plaintiff served as a Management Assistant classified at the GS–344–7 level. Plaintiff's position was within the engineering division under the supervision of the division chief. From November 1990 to April 1991, William J. Parker was plaintiff's direct supervisor. Trial Transcript (Tr.) at 93. Dale Wells was her supervisor for most of 1991 into June 1992. Gerald Anderson served as plaintiff's supervisor from June 1992 to March 1993.

Plaintiff had many duties as a Management Assistant. She prepared and tracked communication system requirements documentation for computers. She prepared and tracked paperwork for equipment purchases for personal computers, office equipment and software. Plaintiff performed research to determine price and availability of parts or equipment and to find sources for equipment, software, supplies, or parts, based upon user requests. Plaintiff's points of contact for her requisition duties included liaison offices of supply, procurement/contracting liaison agencies, vendors, and other outside offices. Plaintiff served as the supply equipment custodian for supply accounts for the division's office equipment and computers. As the supply custodian, she was responsible for maintaining an inventory of the equipment. During the relevant time period, plaintiff also performed duties relating to the budget for the engineering division. These duties included gathering and compiling the budgetary requirements for the individual areas within the division and preparing a submission for the directorate.

In addition to her own testimony, testimony at trial regarding plaintiff's job duties was presented by all three of the engineering division's chiefs during the relevant period. Because the testimony of these four witnesses is most relevant to establishing the

---

**4.** The parties stipulated that plaintiff and defendant worked under similar working conditions. *See* Transcript from Pre–Trial Conference on Oct. 21, 1999 at 90.

**5.** Statements of fact not otherwise cited are taken from the parties' Preliminary Joint Stipulation of Facts, filed with the court on August 4, 1999, and each party's proposed findings of fact as ruled on by the court at the pre-trial conference and memorialized in an order filed by the court on October 26, 1999.

duties plaintiff performed in the engineering division, the court will examine the testimony of each of plaintiff's supervisors and then the testimony of plaintiff herself.[6]

From November 1990 to April 1991, William J. Parker was the chief of the engineering division. Tr. at 91. In describing plaintiff's duties, Mr. Parker testified that plaintiff "kept budget for the division and kept track of expenditures in the division." Tr. at 99. Mr. Parker also stated that plaintiff "kept [and updated] the organization chart." Tr. Plaintiff also issued hand receipts to employees within the division for computers, software, and office equipment. Tr. at 100. Mr. Parker testified that plaintiff, as an equipment custodian, requisitioned office equipment. Tr. at 101. In this regard, her duties included filling out paperwork and keeping track of equipment. Tr. Mr. Parker stated that plaintiff held a very responsible position and that she had good administrative skills. Tr. at 101.

From May 1991 into June 1992, Calvin Dale Wells was chief of the engineering division. Tr. at 337. As plaintiff's supervisor, Mr. Wells testified that plaintiff, as computer custodian, was responsible for personal computers. Tr. at 341. He also stated that "she did a lot of writing like assisting in writing functional instructions ...." Tr. at 356.

From June 1992 until plaintiff's retirement in March 1993, Gerald M. Anderson was chief of the engineering division. Tr. at 535–37. In describing plaintiff's duties, Mr. Anderson stated:

> She performed a wide range of administrative duties.... She kept track of all the manpower actions, loans, transition to manpower, promotions and so forth. She kept track of [the division's] manpower document, which listed all of our slots and grades and rates of pay.... She was our training monitor.... She kept track of all training that was accomplished for people in the division. She made the ... supervisors aware of what training opportunities were scheduled in the future and took their inputs, as far as who they wanted trained and scheduled people for training. She was our awards monitor. She ... would make supervisors aware of when [awards nominations] were due, what [the] requirements were for nominations ... and she would process paperwork for those. She was our self-inspection monitor.... She was our small computer custodian. She would keep track of all our computers, our software, printers and that sort of thing, who they were issued to, where they were located and so forth, and make any necessary reports associated with that.

Tr. at 538–39. He also noted that plaintiff put together the division budget based on input from the various managers regarding their projected costs. Tr. at 539. With respect to the percent of time plaintiff spent on her equipment custodian duties, Mr. Anderson estimated it was about 5 to 10 percent. Tr. at 539.

Plaintiff testified that her duties in the engineering division during the relevant time period involved "the ordering of computers, computer hardware and computer software, internal computer components, hard drives, floppy drives, modems and printers and accessories such as monitors, keyboards, floppy disk screens [and] floppy disks." Tr. at 411. To perform these duties, plaintiff would "research the GSA catalogues ... contact[ ] various vendors to perform research to fulfill the specific requirement of the user or find[ ] a similar item or substitute which met the requirement." Tr. at 411–12. Plaintiff "initiated or prepared purchase requests for computer equipment and software based on the user's stated requirements." Tr. at 412. Once equipment was ordered, plaintiff would follow up on orders in an effort to avoid delays. Tr. at 412. Once the ordered equipment arrived, plaintiff signed for it and verified that the item received was the same as the item requested. Tr. at 412.

Plaintiff stated that the computers and software for which she was custodian were

---

6. In evaluating plaintiff's Equal Pay Act claim, the court has considered all of the evidence and testimony presented at trial. The court will limit its discussion of the testimony in this opinion to that which the court deems most reliable and relevant to the contested matters regarding equality of work. *See* Fed.R.Evid. 401, 602.

personal computers and related equipment. Tr. at 412. She further stated that Mr. Morgan, not she, was responsible for the computers that supported the automatic test equipment and the weapons system in the Test Program Set (TPS) branch. Tr. at 412. Plaintiff believed, however, that Mr. Morgan's and her duties that involved ordering computers were substantially similar. Tr. at 415. Other duties plaintiff performed that she believed were also performed by Mr. Morgan with substantially the same degree of skill, effort, and responsibility were budgetary duties and equipment management and custodian duties. Tr. at 413–15.

### 2. David Morgan's Job Duties at Newark Air Force Base

Mr. Morgan began working at Newark Air Force Base as an Instrument Worker Helper, Wage Grade (WG) 5 in 1976. In June 1989, he was a selected for a promotion to the position of Industrial Engineering Technician, GS–895–11, by Frank Palvolgyi. In June 1990, Mr. Morgan was reassigned to the position of Equipment Specialist (Electronics), GS–1670–11, by Mr. Palvolgyi. In June 1991, Mr. Morgan was reassigned to the TPS branch. Mr. Palvolgyi was Mr. Morgan's direct supervisor for the majority of the relevant time period.

Most of plaintiff's witnesses lacked significant direct knowledge of Mr. Morgan's duties. Division Chief William Parker stated that because Mr. Morgan's position "was a few levels down" in the division, Mr. Parker was not familiar with Mr. Morgan's work. Tr. at 97. Division Chief Calvin Wells provided similar testimony regarding Mr. Morgan's job duties. Although he admitted to being unaware of what Mr. Morgan did on a day-to-day basis, he was familiar with Mr. Morgan's duties through Mr. Morgan's supervisor. Tr. at 340. Division Chief Gerald Anderson said that although he did not know what everyone in the division was doing on a day-to-day basis, it was his responsibility to have general knowledge of everyone's job responsibilities. Tr. at 542.

A number of engineers who testified were unfamiliar with the range of either plaintiff's

or Mr. Morgan's job duties. Mr. Julius Brodbeck, a lead project engineer within the TPS branch, was unable to identify what duties, besides ordering personal computers, plaintiff performed during the relevant time period. Tr. at 22–23. Mr. Brodbeck's testimony regarding tasks performed by Mr. Morgan was limited. He stated that he did not know what Mr. Morgan did for engineers in the branch who were involved with other projects. Tr. at 60–61. Other engineers, such as George Letourneau, Stephen Gerken, and Kenneth Cohen, were also unable to provide helpful testimony regarding the job duties performed by plaintiff or Mr. Morgan. *See, e.g.,* Tr. at 85, 227–28, 388–89.

Nor was the court able to ascertain the range of either plaintiff's or Mr. Morgan's duties from witnesses with responsibilities in the computer field. Robert Porter, a computer systems analyst in the engineering division, testified regarding the computer equipment custodian duties performed by plaintiff and Mr. Morgan. Tr. at 125. Apart from that, Mr. Porter was unable to advise the court on plaintiff's and Mr. Morgan's duties during the relevant time period. Tr. at 125. Both Joanne Good, a computer analyst, and Kathryn Cooper, a computer specialist, testified to limited contact with plaintiff and Mr. Morgan and were unable to provide detailed information regarding either plaintiff's or Mr. Morgan's job duties. Tr. at 150–51, 208–09.

Mr. Morgan and his supervisor, Mr. Palvolgyi, presented the fullest testimony regarding Mr. Morgan's job duties. Mr. Palvolgyi was responsible for bringing Mr. Morgan into the TPS branch of the engineering division. Tr. at 461, 463. Mr. Palvolgyi was Mr. Morgan's direct supervisor from approximately mid–1989 through May 1991. Mr. Palvolgyi then served as chief of the advanced technology section within the division.[7] Tr. at 456, 461. From May 1991 to June 1992, Mr. Palvolgyi was chief of the missile automatic test equipment branch (Missile ATE branch). *See* Joint Exhibit 9. During this time he was not Mr. Morgan's

7. This section was later renamed the TPS branch. Tr. at 457.

direct supervisor.[8] *See id.; see also* Tr. at 456, 461. From June 1992 through January 1993, Mr. Palvolgyi was deputy of the engineering division. During this period he was again Mr. Morgan's supervisor, although not his direct supervisor. Tr. at 456, 461. Finally, from January 1993 through September of 1995, Mr. Palvolgyi was the chief of the engineering division's TPS branch. Tr. at 456. During this time he was again Mr. Morgan's direct supervisor. Tr. at 461. The testimony given by Mr. Palvolgyi was limited to his knowledge of Mr. Morgan's work during the time period during which Mr. Palvolgyi held a supervisory position over Mr. Morgan. It did not cover the time period during which Mr. Palvolgyi was the chief of the Missile ATE branch. Tr. at 462.

As Mr. Morgan's supervisor, Mr. Palvolgyi testified that Mr. Morgan was brought into the TPS branch to "work[ ] with the engineers, order[ ] parts, manag[e] parts, tak[e] care of things like maintenance scheduling." Tr. at 463. Mr. Morgan also arranged for the disposal of equipment no longer needed by the branch and arranged for the disposal of chemicals. Tr. at 463. Mr. Morgan's duties changed depending on the maturity of the particular project for which he was ordering parts. Tr. at 464. On more mature projects, Mr. Morgan would generally get a part number from the engineer to order the part. For newer projects, he would frequently have to do a significant amount of research to procure parts. Tr. at 464. Mr. Morgan would call various vendors to determine who could provide a particular part, or if a part needed to be replaced, he would find out what replacement part would work. Tr. at 464.

Mr. Palvolgyi testified that Mr. Morgan needed technical skills to perform his duties. In order to replace parts, Mr. Morgan needed to identify what replacement parts would work and make sure they were mechanically and electronically compatible with the equipment for which they were needed. Tr. at 465–66. When asked how much of Mr. Morgan's time was spent procuring parts for the engineers, Mr. Palvolgyi stated that he wasn't sure the exact amount of time. Tr. at 466. He stated, however, that it was a "good portion" of Mr. Morgan's time. Tr. at 466.

At trial, David Morgan testified to his duties within the TPS branch. He stated that he spent a majority of his time "research[ing] parts and things for the engineering group." Tr. at 248, 334–35. In this regard, Mr. Morgan "looked up stock numbers, looked up part numbers ... and did ordering" based on the specifications of the part an engineer requested. Tr. at 249. He ordered "resistors, diodes, capacitors, [and] connectors." Tr. at 249. When substitution parts were necessary, he would determine the specifications of a component by looking at the component and its instructions or by looking in the manufacturer's catalog. Tr. at 274.

During the relevant time period, Mr. Morgan was also the equipment custodian for automatic test equipment. In his capacity as an equipment custodian he was responsible for supplying, inventorying and managing equipment and computers. Mr. Morgan dealt with liaison offices to check on the status of equipment orders. Part of Mr. Morgan's job in the engineering division included computer software custodian duties. He was responsible for signing out the software and maintaining an inventory list.

With respect to Mr. Morgan's equipment custodian duties, Mr. Morgan stated that the automatic test equipment for which he served as custodian was very different from personal computer equipment. Tr. at 301. In his capacity as equipment custodian for the automatic test equipment, he was responsible for keeping a logbook of equipment and parts. Tr. at 302. His other responsibility for this job was to do an annual inventory of the equipment. Tr. at 302–03. Mr. Morgan said his equipment custodian duties for automatic test equipment took up very little time. Tr. at 303. In addition to being the equipment custodian for the automatic test equipment, Mr. Morgan was the alternate custodian for the automatic data processing equipment.[9] Tr. at 304. With re-

---

8. Jerry Dickey, Mr. Morgan's direct supervisor during this time period, did not testify at trial.

9. This is the account for which plaintiff was the equipment custodian. Tr. at 412.

spect to the amount of time Mr. Morgan spent performing those duties, Mr. Morgan stated that he spent "very little to none." Tr. at 304.

### 3. Comparison of Plaintiff's and David Morgan's Jobs

While both plaintiff and Mr. Morgan performed similar tasks with respect to their equipment custodian duties, including responsibilities for equipment inventory, the court finds that the overall job duties performed by plaintiff and Mr. Morgan were not substantially equal under the standards of the Equal Pay Act and applicable regulations.

■■■ In evaluating the work performed by plaintiff and Mr. Morgan, the court examines the similarity between the tasks each were required to perform. Differences in subject matter do not render the jobs unequal if the tasks involved are the same. *See Ellison*, 25 Cl.Ct. at 493; *see also Spaulding v. University of Washington*, 740 F.2d 686, 697 (9th Cir.1984). In this case and based on the testimony before it, the court finds that the skills and effort needed for the performance of plaintiff's and Mr. Morgan's respective jobs, as well as the subject matters involved, were different to an extent that prevents the court from concluding that they were "substantially equal" for Equal Pay Act purposes.

The position description for Mr. Morgan's Equipment Specialist position states, among other things, that technical knowledge was a necessary component of the position. Specifically, the position description includes as knowledge required for the position, "[f]amiliarity with automatic test equipment, computers, electronic and mechanical systems and components, equipment operations and maintenance concepts." Joint Exhibits 3 & 4 at ¶ III.1. It further requires "[k]nowledge of Automatic Test Station, ICT Station, and interface adapter concepts, operation, handling, scheduling and monitoring." *Id.* at ¶ III.5. The position description, by itself, is not evidence of the tasks actually performed. However, testimony at trial made it clear that Mr. Morgan both possessed and utilized technical knowledge of the type required by

his position description in the performance of his duties. Tr. at 270–74, 284–85, 296.

Plaintiff's position description provides a detailed list of administrative tasks required by the position, including record-keeping and data management duties. Joint Exhibit 6 at ¶¶ II.1–10. Testimony at trial made it clear that plaintiff was not required to possess or utilize the same level of technical knowledge as Mr. Morgan successfully to perform her job duties. Tr. at 356–57, 545. Plaintiff's procurement duties were generally limited to personal computers and office equipment. Although Mr. Morgan was also responsible for ordering computers and computer equipment in the TPS branch, the amount of time he performed these duties was minimal.

The parties stipulated that plaintiff's and Mr. Morgan's duties overlapped to the extent they were both performing equipment custodian duties. Preliminary Joint Stip. of Facts at ¶ 6. Much of the testimony regarding the parties' equipment custodian duties pertained to the amount of time spent by plaintiff and Mr. Morgan on their respective equipment custodian duties. There is a disconnect between plaintiff's and Mr. Morgan's view of equipment custodian duties and the description of those duties. When asked what equipment custodian duties entailed, Mr. Morgan stated, "Equipment custodian is just the guy that inventories [a piece of equipment] and writes the number down on his logbook, and it comes out on his [inventory] list." Tr. at 300. This contrasts with plaintiff's response to a question by defendant regarding the duties performed by Mr. Morgan. Plaintiff stated that Mr. Morgan was "doing the enhancement of equipment custodian duties or ordering the parts and equipment," Tr. at 436, thereby wrapping the "equipment procurement" responsibilities of Mr. Morgan into "equipment custodian" duties.

To the extent both plaintiff and Mr. Morgan maintained inventory logs of the equipment for which they were responsible, their duties were similar. Mr. Morgan's procurement work was not, in the light of the testimony of Mr. Morgan and his supervisor, or in the light of Mr. Morgan's job description,

part of equipment custodian duties. Plaintiff's procurement duties did not appear to have occupied the majority of her time, were mainly limited to office equipment and computers, and were not shown to have required or to have utilized specialized technical skills. Mr. Morgan's duties in procuring parts for engineers, the duties to which he devoted a majority of his time, in fact required and utilized technical skills and effort to a degree sufficient to defeat the claim that plaintiff and Mr. Morgan performed substantially equal work.

## III. Conclusion

This opinion records the court's judgment that plaintiff did not establish at trial facts sufficient to support a finding of a violation of the Equal Pay Act. The court notes, however, some testimonial evidence of gender bias which, in a complaint timely brought, might have supported relief under statutes other than the Equal Pay Act. *See, e.g.,* Title VII, 42 U.S.C. §§ 2000e–2000e–17 (1994). For example, in the course of testimony, a former engineering supervisor referred to the plaintiff by a diminutive of her first name and described her as a "glorified secretary." Tr. at 484. This is demeaning and inappropriate. The government can hardly expect to generate confidence in its personnel practices if managers do not better understand bias and avoid communicating it.

For the reasons stated in Part II of this opinion, plaintiff has failed to establish a prima facie case under the Equal Pay Act. Plaintiff has not proven that she and the comparable male employee were performing "equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). Accordingly, the Clerk of the Court is directed to enter judgment in favor of the defendant. Each party shall bear its own costs.

IT IS SO ORDERED.